UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MALINDA FAIRCHILD-CATHEY,
RICHARD MUMFORD, AND AARON
FORJONE, on behalf of all others similarly
situated, *et al.*

                            Plaintiffs,

       -against-                               6:21-CV-01173 (LEK/ML)

AMERICU CREDIT UNION,

                          Defendant.

---

## **MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Malinda Fairchild-Cathey, on behalf of herself and a class of others similarly situated, commenced this action against Americu Credit Union ("Defendant") on October 27, 2021, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. Dkt. No. 1. Defendant later filed a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 9. Thereafter, Plaintiff filed an amended complaint, Dkt. No. 12 ("Amended Complaint"), which mooted Defendant's motion to dismiss. Dkt. No. 14. In the Amended Complaint, Plaintiff named two additional plaintiffs: Richard Mumford and Aaron Forjone. Am. Compl. at 1. Plaintiffs now assert the following causes of action against Defendant: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) violation of New York General Business Law ("GBL") § 349. Id. at 30–33.

Presently before the Court is Defendant's motion to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted. Dkt. No. 21 ("Motion"). Plaintiffs

oppose the motion. Dkt. No. 25 ("Plaintiffs' Response"). Defendant has submitted a reply to Plaintiffs' Response. Dkt. No. 26 ("Defendant's Reply").

For the reasons that follow, Defendant's motion to dismiss is granted in part, and denied in part.

## II.   BACKGROUND

The following facts, which the Court assumes to be true at this stage, are taken from the Amended Complaint.

### A.  Factual History

Plaintiffs hold or formerly held checking accounts with Defendant. Am. Compl. ¶ 51. Defendant is a credit union which provides banking services to its members. Id. ¶ 9. According to Plaintiffs, the two documents attached to their Amended Complaint govern Plaintiffs' relationship with Defendant. Am. Compl. ¶ 72. The documents include a "Schedule of Fees and Charges," Dkt. No. 12, Ex. A ("Fee Schedule"), along with a "Membership and Account Agreement," Dkt. No. 12, Ex. B ("Membership Agreement") (collectively, "Account Documents").

When Defendant's members—such as Plaintiffs—attempt a transaction but lack sufficient funds to complete the transaction, the Account Documents permit Defendant to charge the accountholder a $28 insufficient fund ("NSF") fee. Am. Compl. ¶ 12. The Fee Schedule provides that Defendant may assess a $28 fee per "each" item returned for insufficient/uncollected funds. Id. ¶ 21 (quoting Fee Schedule at 2). Furthermore, the Membership Agreement's "overdrafts" section provides in relevant part:

> If, on any day, the available funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, item, transaction or other items posted to your account plus any applicable fee ("overdraft"), we may pay or return the overdraft. The Credit

> Union's determination of an insufficient account balance may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do not have to notify you if your account does not have sufficient funds to pay an overdraft. Your account may be subject to a charge for each overdraft regardless of whether we pay or return the overdraft.

Am. Compl. ¶ 51 (quoting Membership Agreement at 4).

### 1. NSF Fees

Plaintiffs allege that Defendant assesses multiple NSF fees on a single transaction in violation of the Account Documents. Am. Compl. ¶¶ 16, 18. Plaintiffs concede that the Account Documents permit Defendant to charge a single $28 NSF fee when a transaction is returned for insufficient funds or paid despite insufficient funds. Id. ¶ 12. However, they allege that Defendant breaches the Account Documents by charging more than one $28 NSF fee on the same transaction because reasonable consumers would understand that the same transaction may incur only a single NSF fee. Id. ¶ 13. The alleged breach occurs when a transaction is repeatedly processed by a merchant, and an NSF fee is assessed for each processing request, despite Plaintiffs never sending a request to re-process the payments. Id. ¶ 18.

The dispute between the two parties hinges on the meaning of "item" in the Account Documents. Plaintiffs allege that the Account Documents guarantee that a single NSF Fee will be assessed for "each item." Pls.' Resp. at 1. Specifically, Plaintiffs assert that an "item" is the same "item" even when reprocessed a second or third time after an initial return for insufficient funds because "item" refers to an accountholder's instruction for payment, id., "especially when—as here—Plaintiff Fairchild-Cathey took no action to resubmit the transaction." Am. Compl. ¶ 23.

Defendant ascribes a different meaning to "item." Defendant reads the Account Documents collectively as authorizing it to assess an NSF fee "on any day," and for "each

3

overdraft," i.e., any day a transaction is presented for payment and the account lacks sufficient funds. Mot. at 2–3.

### 2.  Overdraft Fees on APPSN Transactions

Plaintiffs also allege that Defendant unlawfully charges overdraft fees on transactions referred to as Authorize Positive Purportedly Settle Negative ("APPSN") transactions. Id. ¶ 54. This sort of transaction allegedly occurs when a customer makes a purchase and the customer's account balance is reduced from the initial transaction without an overdraft. However, settlement of a subsequent unrelated transaction that lowers the customer's available balance will result in an overdraft on the initial transaction, irrespective of the initial positive balance of the first transaction. Id. ¶ 60. According to Plaintiffs, in these APPSN transactions, there are always positive funds available in the account to cover the transaction, but subsequent transactions result in a negative balance. Id. ¶ 74, 76. Consequently, Defendant allegedly assesses overdraft fees on APPSN transactions that have sufficient funds to cover a transaction. Id. ¶ 80.

To carry out this practice, Plaintiffs allege that Defendant "actually authorizes transactions on positive funds, [then] claims to set those funds aside on hold, but then fails to use those same funds to settle those same transactions." Id. ¶ 77. Plaintiffs further state that because APPSN transactions are debited from the account immediately, and such withdrawals take place upon initiation, they cannot be re-debited later. Id. ¶ 82. However, Defendant manages to re-debit the account anyway, which leads Plaintiffs to believe that "something more is going on." Id. ¶ 86. The "more" according to Plaintiffs is an alleged surreptitious batching process. Id. According to Plaintiffs, "at the moment a debit card transaction is getting ready to settle, [Defendant] does something new and unexpected, during the middle of the night, during its nightly batch posing process." Id. Specifically, Plaintiffs allege that Defendant "releases the hold

placed on the funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time." Id. ¶ 86. This secret step, Plaintiffs allege, permits Defendant to charge overdraft fees on transactions that should have never caused an overdraft because they were authorized with sufficient funds. Id. ¶ 87.

3. *ATM Out of Network Fees Claim*

Plaintiffs' final set of breach of contract claims relate to Defendant's policy of out-of-network-ATM ("OON") fees. Plaintiffs allege that Defendant's Account Documents misrepresent to its members the nature of Defendant's assessment of these fees. Id. ¶ 120. Plaintiffs specifically allege that Defendant's Account Documents mislead its members into believing that a balance inquiry is not a separate, individual transaction; rather, members are led to believe that a balance inquiry is part of a single transaction, such as a deposit or withdrawal. Id. However, when a member uses an out-of-network ATM, they are charged two OON fees per cash withdrawal preceded by a surprise balance inquiry fee, which results in three discrete fees that are not provided for in the Account Documents. Id. ¶¶ 121–22. Thus, reasonable consumers are unaware of the "triple OON Fees" and this practice allegedly violates the guarantees of the Account Documents. Id. ¶¶ 122, 129.

4. *Implied Covenant of Good Faith and Fair Dealing*

Dovetailing with Plaintiffs' breach of contract claims, Plaintiffs also raise claims relating to the implied covenant of good faith and fair dealing. Plaintiffs allege that Defendant "abuses the power it has over customers and their bank accounts and acts contrary to their reasonable expectations under the Account Documents. This is a breach of [Defendant's] implied covenant to engage in fair dealing and act in good faith." Am Compl. ¶ 48. Similarly, Plaintiffs also state that "[b]y exercising its discretion in its own favor . . . by charging more than one fee on a single

transaction, [Defendant] breaches the reasonable expectation of Plaintiff Fairchild-Cathey and other customers and in doing so violates the implied covenant to act in good faith." Id. ¶ 48.

> 5. *Violation of New York General Business Law § 349*

Plaintiffs final set of claims arise under New York General Business Law § 349 ("GBL § 349). Plaintiffs allege that Defendant "omitted, suppressed, and concealed the material fact that it would charge fees on APPSN transactions, charge multiple fees on the same transaction, and and [sic] charge OON fees for balance inquiries made in connection with a withdrawal at an out-of-network ATM." Am Compl. ¶ 169(b). Consequently, Plaintiffs allege that Defendant "systematically engaged in these deceptive, misleading, and unlawful acts and practices, to the detriment of Plaintiffs and members of the New York Subclasses" in violation of GBL § 349. Id.

## B. Procedural History

On October 27, 2021, Plaintiff Fairchild-Cathey commenced this class action alleging breach of contract and breach of the implied covenant of good faith and fair dealing against Defendant. Dkt. No. 1. In response to the Complaint, Defendant filed a motion to dismiss for failure to state a claim on January 7, 2022. Dkt. No. 9.

On January 28, 2022, Plaintiff filed an amended complaint, Dkt. No. 12, which inserted two new named Plaintiffs in this class action: Mumford and Forjone. See id. Plaintiffs attached two exhibits to the Amended Complaint. First, Plaintiffs attached what they considered the relevant Fee Schedule that governed the Agreement, Dkt. No. 12, Ex. A. Second, they attached what they alleged was the operable Membership Agreement between themselves and Defendant. Dkt. No. 12, Ex. B.

On March 10, 2022, Defendant filed a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). Dkt. No. 22. However, in Defendant's motion to dismiss, it attached

documents that were not included in Plaintiffs' Amended Complaint. Dkt. No. 22-3. Defendant

contended that these documents governed the parties' contractual relationship. See generally id.

Defendant attached: (1) a different version of the membership agreement from what Plaintiffs

attached, which purports to govern Fairchild-Cathey's claims with respect to a July 5, 2019, fee,

Dkt. No. 22-3 at 12–18 ("Exhibit 2"); (2) another version of the membership agreement that

purports to govern Mumford's claims arising from fees levied on June 22, 2020, and June 27,

2020, Dkt. No. 22-3 at 20–26 ("Exhibit 3"); (3) Defendant's Truth-In-Savings Disclosure

("Exhibit 4"); and (4) a 2019 version of Defendant's Electronic Fund Transfers Agreement and

Disclosure that allegedly governs Forjone's claims related to the fees levied on him, Dkt. No. 22-

3 at 34–40 ("Exhibit 5"). Thus, the parties sharply disputed which documents governed

Plaintiffs' claims against Defendant.

On October 14, 2022, in light of the extra material presented outside Plaintiffs' Amended

Complaint, the Court directed the parties to provide supplemental briefing explaining whether

the Court should—pursuant to Rule 12(d)—exclude the materials presented by Defendant, or

instead, consider the extraneous material and convert the Motion to a motion for summary

judgment under Rule 56. Dkt. No. 48. Plaintiffs argue that the Court should exclude the material

because they have not been established as relevant to the case, but if the Court opts not to, it

should afford Plaintiffs the opportunity to take discovery and provide supplemental briefing.

Pls.' Supp. Resp. at 1–2. Conversely, Defendant asserts that the Court should not exclude the

materials and instead convert the motion to dismiss into a motion for summary judgment with

limited discovery. Def.'s Supp. Resp. at 11.

III.   LEGAL STANDARD

When material "outside the pleadings" is presented to a court when adjudicating a Rule 12(b)(6) motion to dismiss, a court is "afforded two options" by Federal Rule of Civil Procedure 12(d): the court may (1) "exclude[] the extrinsic documents or (2) convert the motion to one for summary judgment and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by [Federal] Rule 56." Chambers v. Time Warner, Inc., 282 F.3d 147, 154 (2d Cir. 2002). Upon conversion, a court "must give notice to the parties *before* converting a motion to dismiss pursuant to Rule 12(b)(6) into one for summary judgment and considering matters outside the pleading." Sahu v. Union Carbide Corp., 548 F.3d 59, 67 (2d Cir. 2008) (quoting Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999)) (emphasis in original).

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. See Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Id. at 556.

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more

than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678

(citing Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere

possibility of the alleged misconduct based on the pleading facts, the pleader has not

demonstrated that she is entitled to relief and the action is subject to dismissal. See Iqbal at 678–

79.

## IV.    DISCUSSION

Defendant states that Plaintiffs' breach of contract claims must be dismissed because

(1) the Account Documents clearly and unambiguously refute their theories of liability and

because (2) Defendant follows its disclosed policies in the Account Documents. Mot. at 3–4.

Defendant also argues that Plaintiffs' claim concerning breach of the implied covenant of good

faith and fair dealing should be dismissed because it is duplicative of the breach of contract

claims. Id. at 26. Additionally, Defendant argues that Plaintiffs' GBL § 349 claim fails because it

is too conclusory. Id. at 27–28. Finally, Defendant urges the Court to find that Plaintiffs' claims

are preempted by the Truth in Savings Act ("TISA") and "other implementing regulations." Id. at

28–29.

Before addressing the parties' substantive arguments, the Court notes that the parties

disagree over the relevant documents. Plaintiffs ask the Court to consider only the documents in

their Amended Complaint, including the Fee Schedule and Membership Agreement that they

allege were in effect when Plaintiffs became members of Defendant. Pls.' Resp. at 6–7.

Defendant, however, provides an affidavit from an employee ("Cornacchia Affidavit")

containing the following allegedly relevant documents: (1) a subsequent Membership Agreement

effective on July 5, 2019 that purportedly governs Fairchild-Cathey's claims related to a July 5,

2019 fee, Exhibit 2; (2) a subsequent Membership Agreement effective on June 22, 2020, and

June 27, 2020, that purports to govern Mumford's claims, Exhibit 3; (3) Defendant's Truth-In-Savings Disclosure, Exhibit 4; and (4) a 2019 version of Defendant's Electronic Funds Transfer Agreement and Disclosure that ostensibly governs Forjone's claims, Exhibit 5. Defendant urges the Court to consider these documents, because failure to do so would "allow Plaintiffs to cherry-pick" the relevant documents. Def.'s Resp. at 2.

The Court will now analyze which documents are integral to the Amended Complaint, and then address whether the Motion should be converted to one for summary judgment pursuant to Rule 12(d).

**A. Documents Relevant to Plaintiffs' Amended Complaint**

"Consideration of materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006). "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Id. at 152 (citations omitted). "Even where a document is not incorporated by reference the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effects,' which renders the document 'integral' to the complaint." Chambers, 282 F.3d at 153 (cleaned up) (quoting Int'l Audiotext Network, Inc. v. Am.Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)).

Additionally, to consider a document not attached to a complaint, not only must the document be integral to the complaint, but the complaint must solely rely on the document. See Williams v. Time Warner, Inc., 440 Fed. App'x 7, 9 (2d Cir. 2011) (observing that a "narrow exception [is recognized for] . . . 'a document upon which the complaint *solely* relies and which is *integral to the complaint*'" (emphasis in original) (quoting Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007))). Furthermore, "[t]he Second Circuit has stressed that actual reliance on the

extraneous material is required, and that this exception will not be satisfied by the Plaintiff's 'mere notice or possession' of such material." Allen v. Chanel Inc., No. 12-CV-6758, 2013 WL 2413068, at *6 (S.D.N.Y. June 4, 2013) (quoting Chambers, 282 F.3d at 152). The Second Circuit has also cautioned: "[Before] materials outside the record may become a basis for dismissal, several conditions must be met. For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." Faulkner, 463 F.3d at 134. And, critically, "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." Id.

Here, the two documents attached to the Amended Complaint—the Membership Agreement and Fee Schedule provided by Plaintiffs—must be considered because the "complaint is deemed to include any written instrument attached to it as an exhibit." Chambers, 282 F.3d at 152 (citations omitted). Likewise, Plaintiffs concede that Exhibit 4 of Defendant's attachments may also be considered as integral to the Amended Complaint. Plaintiffs state, "Exhibit 4 appears to be the entirety of the Truth-in Savings Disclosure, one page of which was attached to the operative complaint. Because the document was partially part of the amended complaint, Plaintiffs do not dispute that the Court can consider it even without conversion." Pls.' Suppl. Resp. at 5. Because the Amended Complaint "relies heavily upon [the document's] terms and effects, [the document is] render[ed] . . . 'integral' to the complaint." Chambers, 282 F.3d at 153 (cleaned up). Additionally, "no dispute exists regarding the authenticity or accuracy" of Exhibit 4. Faulkner, 463 F.3d at 134. Finally, it is "clear that there exist no material disputed issues of fact regarding the relevance of" Exhibit 4. Id. Accordingly, Exhibit 4, the Truth-In-Savings Disclosure, is integral to the Amended Complaint, and the Court will consider the entirety of the document for purposes of this motion.

Next, Defendant urges the Court to consider Exhibits 2, 3 and 5 attached to Defendant's Motion. However, because Plaintiffs' Amended Complaint does not reference these documents, Dkt. No. 12, the Amended Complaint does not "rel[y] heavily upon [their] terms and effects." Int'l Audio Network, 62 F.3d at 72. Even assuming *arguendo* that the documents are integral to the Amended Complaint, disputes exist as to whether they are relevant to this action, and as such the documents cannot serve as "the basis for a dismissal." Faulkner, 463 F.3d at 134. Indeed, Plaintiffs dedicate the majority of their supplemental response disputing the relevance of Exhibits 2, 3 and 5. See, e.g., Pls.' Suppl. Resp. at 3 ("The parties disagree, however, as to whether Exhibit 2 to the Cornacchia Affidavit governs the remaining July 5, 2019 fee."); id. at 5 ("[Exhibit 5] is irrelevant regardless of any conversion."); id. at 7 ("Exhibit 3 [does not] properly govern[] Mumford's claims."). Because "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document," Faulkner, 463 F.3d at 134, these documents cannot be considered as a basis for dismissal on a 12(b)(6) motion. See id.

Accordingly, because Exhibits 2, 3, and 5 are not integral to the complaint and cannot be considered for purposes of ruling on a motion to dismiss under 12(b)(6), the Court next considers whether the Court should convert the motion to dismiss into a motion for summary judgment.

### B.  Conversion of the Motion to Dismiss into One for Summary Judgment

"[A] district court has discretion to convert a motion to dismiss into a motion for summary judgment." Garcha v. City of Beacon, 351 F. Supp. 2d 213, 216 (S.D.N.Y. 2005). "Federal Courts 'have complete discretion to determine whether or not to accept the submissions of any material beyond the pleadings' offered in conjunction with a Rule 12(b)(6) motion, and thus complete discretion in determining whether to convert the motion to one for summary

judgment." Carione v. U.S., 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2004) (quoting 5C Wright &

Miller, Federal Practice and Procedure, Civil § 1366 (3d ed. 2004)).

Plaintiffs argue that "the Court must exclude Defendant's outside-the-pleading

documents because they have not been established as relevant to this case and the issues before

the Court." Pls.' Suppl. Resp. at 1–2. Plaintiffs assert that Defendant's submitted documents do

not actually govern the following fees at issue. Specifically, Plaintiffs posit that the documents

are not effective because Plaintiffs were never provided notice of these later documents that

allegedly came into effect after Plaintiffs became members of the Defendant-credit union; and

thus, Defendant breached its own contractual agreement that guarantees providing notice to its

members regarding changes to contractual terms. Id. at 4, 8. Defendant, conversely, argues that

the Court should not exclude the materials it presented because doing so would "frustrate

established principles of contract and settled case law." Def.'s Suppl. Resp. at 4.

As discussed above, courts "have complete discretion . . . whether to convert the

[12(b)(6)] motion to one for summary judgment." Carione, 368 F. Supp. 2d at 191 (citations

omitted). However, "in exercising its discretion the court looks to the substance of the motion."

Ansonia Tenants' Coalition, Inc. v. Ansonia Assocs., 163 F.R.D. 468, 470 (S.D.N.Y. 1995)

(citations omitted). For instance, courts in this Circuit routinely decline to convert a motion to

dismiss to summary judgment when discovery has yet to begin. See Wajilam Exports

(Singapore) Pte. Ltd. v. ATL Shipping Ltd., 475 F. Supp. 2d 275, 278 (S.D.N.Y. 2006) ("[T]he

decision whether to convert is a matter for the court's discretion. That discretion will not be

exercised here. Discovery has not begun yet, as plaintiff itself complaints. There would be little

point in considering a summary judgment motion when significant relevant facts may be

discovered." (internal citations omitted)); Hoy v. Inc. Vill. of Bayville, 765 F. Supp. 2d 158, 164

13

(E.D.N.Y. 2011) ("[T]he Court concludes that plaintiffs in this action are entitled to discovery before having to oppose a motion for summary judgment, and thus conversion of the motion is unwarranted."); Heras v. Metro. Learning Inst., Inc., No. 19-CV-2694, 2021 WL 66288, at *3 (E.D.N.Y. Jan. 7, 2021) (declining to convert a motion to dismiss for summary judgment because "no discovery has been conducted yet"); Stephens v. Bayview Nursing & Rehab. Ctr., No. 07-CV-0596, 2008 WL 728896, at *4 (E.D.N.Y. Mar. 17, 2008) ("Here, in its broad discretion . . . the Court finds that conversion to summary judgment is inappropriate and that further discovery is necessary at this juncture.").

The Court finds it appropriate to follow the lead of other courts in this Circuit and declines to convert the motion to dismiss into a motion for summary judgment. Because the Court has "complete discretion" whether to convert Defendant's Motion, Carione, 368 F. Supp. 2d at 191 (citations omitted), and because discovery has yet to begin, see generally Docket, "significant relevant facts may be discovered" such that conversion to summary judgment is unwarranted. Wajilam Exports (Singapore) Pte. Ltd., 475 F. Supp. 2d at 278.

Accordingly, the motion to dismiss "will be considered under the familiar standards of review . . . disregarding material submitted by [Defendant] that is extraneous to the Complaint . . . . " Id. (citing Greco v. Trauner, Cohen & Thomas, L.L.P., 412 F.3d 360, 263 (2d Cir. 2005)). The Court will "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 118, 122 (2d Cir. 2013) (quoting Chase Grp. Alliance LLC v. N.Y.C. Dep't of Fin., 620 F.2d 146, 150 (2d Cir. 2010)). As such, the Court excludes all of Defendant's attached materials except for the Truth-in Savings Disclosure in Exhibit 4 because that document is integral and relevant to Plaintiffs' Amended Complaint.

### C. Breach of Contract Claims

At the motion to dismiss stage, "a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." <u>Orchard Hill Master Fund Lt. v. SBA Commc'ns Corp.</u>, 830 F.3d 152, 156 (2d Cir. 2016). Contractual terms are unambiguous if they have "'a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion.'" <u>Met. Life Ins. Co. v. RJR Nabisco, Inc.</u>, 906 F.2d 884, 889 (2d Cir. 1990) (quoting <u>Breed v. Ins. Co. of N. Am.</u>, 46 N.Y.2d 351, 355 (N.Y. 1978)); <u>see also</u> <u>Eternity Global Master Fund Ltd. vs. Morgan Guar. Tr. Co. of N.Y.</u>, 375 F.2d 168, 178 (2d Cir. 2004) (noting that "if a contract is ambiguous . . . a court has insufficient data to dismiss a complaint for failure to state a claim").

On the other hand, a contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business." <u>Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.</u>, 773 F.3d 110, 114 (2d Cir. 2014). Critically, at this stage, the Court must "resolve any contractual ambiguities in favor of the plaintiff." <u>Subaru Distribs. Corp. v. Subaru of Am., Inc.</u>, 425 F.2d 119, 122 (2d Cir. 2005).

1. *Assessment of Multiple NSF Fees on a Single Transaction*

Plaintiffs first challenge Defendant's practice of assessing multiple NSF fees on a single transaction. These fees may reprocess several times between Defendant and a third-party merchant, which results in multiple fees being levied on Plaintiffs. Plaintiffs argue that under the Account Documents, Defendant may impose only one NSF fee per order or instruction for payment that results in a negative balance, not an NSF fee per each *processing request* of that

15

payment. Pls.' Resp. at 11–12. Defendant, however, disputes this reading of the Account

Documents. It notes, "the Membership Agreement, in no uncertain terms, states that

resubmission of a transaction on any day may incur a new NSF fee, and the Fee Schedule sets

the amount of the fee." Def.'s Resp. at 13.

> Here, the Membership Agreement states in relevant part:

>> If, on any day, the available funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, *item*, transaction or other items posted to your account plus any applicable fee ("overdraft"), we may pay or return the overdraft. The Credit Union's determination of an insufficient account balance may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do not have to notify you if your account does not have sufficient funds to pay an overdraft. Your account may be subject to a charge for each overdraft regardless of whether we pay or return the overdraft.

Am. Compl. ¶ 51 (quoting Membership Agreement at 4) (emphasis added). Notably, the Account

Documents fail to define the meaning of "item."

> Plaintiffs argue that the plain promise from Defendant is to assess a single $28 fee for

"items" returned for insufficient funds, not each time the same "item is returned for insufficient

funds." Pls.' Resp. at 11. Consequently, Plaintiffs contend that the term "item" refers to the

"accountholder's single order or instruction for payment from [their] account—not subsequent

reprocessing attempts." Id. Thus, according to Plaintiffs, only a single NSF fee may be charged

per item, and that a single Automated Clearing House ("ACH")[1] request made by a member is a

single "item irrespective of how many times that request is processed." Id. Plaintiffs further

---

[1] ACH is a financial network used for electronic payments and money transfers. ACH payments may be used to transfer money from one bank account to another. See *Automated Clearing House*, BUREAU OF THE FISCAL SERV., U.S. DEP'T. OF TREASURY, https://www.fiscal.treasury.gov/ach/.

support their argument by noting that in trade usage, an "item" means, "[a] negotiable instrument or a promise or order to pay money handled by a bank for collection or payment." Id. at 14 (quoting N.Y. U.C.C. § 4-104(1)(g). They also argue that the term "item" as used in the banking industry refers to an accountholder instruction for payment and does not become a new "item" when reprocessed. Pls.' Resp. at 14.

Defendant, however, claims without elaboration that the Membership Agreement defines when an overdraft occurs and then states that it can assess a fee for "each overdraft." Mot. at 13. Furthermore, Defendant argues that the Membership Agreement states that Defendant may assess a fee "on any day" it returns a transaction due to insufficient funds, and that each time a merchant processes an ACH request, the request becomes a new item even if the member made only a single attempt at payment. Id. Coupling this understanding with the Fee Schedule that states that a $28.00 fee will be assessed for each overdraft, Defendant concludes: "the Membership Agreement, in no uncertain terms, states that the resubmission of a transaction on any day may incur a new NSF fee, and the Fee Schedule sets the amount of the fee." Id.

At this stage in the litigation, the Court finds that both arguments are tenable. Therefore, the Court is unpersuaded that the term "on any day" unambiguously permits Defendant to assess multiple NSF fees on a single ACH request made by a member. The Court finds that there is a reasonable basis to read the Membership Agreement and Fee Schedule together such that the term "item" refers to any and all requests made by a member or third-party merchant. Concurrently, it is also reasonable to read "item" as permitting Defendant to charge only a single NSF fee irrespective of the number of times the ACH request is processed.

This understanding accords with a court in the Eastern District of New York that analyzed identical contractual provisions in a similar breach of contract action. See Watson v.

Suffolk Fed. Credit Union, No. 20-CV-1531, WL 2022 523543, at *4 (E.D.N.Y. Feb. 22, 2022)

(holding that the identical language at issue here was ambiguous). Moreover, the Court's finding

dovetails with the many federal courts that have analyzed the term "item" in similar agreements;

those courts routinely found that the term is ambiguous in cases with virtually identical facts.[2]

See, e.g., Perks v. TD Bank, N.A., 444 F. Supp. 3d 635, 640 (S.D.N.Y. 2020) (holding that the

term "item" in a materially similar agreement to the one here was ambiguous); Lamoureux v.

Trustco Bank, 592 F. Supp. 3d 14, 35–36 (N.D.N.Y. 2022) ("As Plaintiff cites in his opposition,

multiple courts, including those within the Second Circuit, have found the term 'item' to be

ambiguous within this context."). As a result, "[b]ecause the parties' competing interpretations of

the account documents are reasonable, Plaintiffs['] breach of contract claim regarding

[Defendant] charging multiple NSF fees on the same item is sufficient to withstand

[Defendant's] motion to dismiss." Lamoureux, 592 F. Supp. 3d at 36. Accordingly, Defendant's

motion to dismiss is denied with respect to Plaintiffs' breach of contract claim regarding

Defendant's practice of assessing NSF fees.

> ### 2. *OD Fees on APPSN Transactions*

Defendant next argues that Plaintiffs' claim regarding OD fees on APPSN transactions

fails to allege a breach of contract for two reasons: (1) Defendant's Membership Agreement

unambiguously states that Defendant determines overdrafts when a transaction is presented for

payments, not at authorization; and (2) Plaintiffs' theory of liability that held funds must be

sequestered specifically for the payment authorized by Defendant contravenes the terms of the

Membership Agreement. Mot. at 19–25.

---

[2] Plaintiffs cite over twenty cases to support their position that federal courts have ruled in their favor when addressing similar claims and contracts. Pls.' Resp. at 8–11.

First, Defendant states that Plaintiffs fail to point to any language in the Membership Agreement which promises that an overdraft would be determined only at the time the debit card transaction was preauthorized. Id. at 19. Instead, Defendant maintains, the "Membership Agreement **repeatedly** provides in plain and ordinary terms that [Defendant] will determine whether a debit card transaction is subject to an overdraft fee at the time the item is presented for payment by the merchant and processed by [Defendant], not at the time of authorization." Mot. at 20 (emphasis in original). Moreover, Defendant posits that the Membership Agreement's "Payment of Overdrafts" provision "links overdraft determination to the second step (posting payment, presentation)." Id. Defendant's position relies upon a provision from the excluded documents it attached, but Defendant nevertheless asserts the following provision from Plaintiffs' attached Membership Agreement also supports its argument:

> If, on any day, the available funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, item, transaction or other items posted to your account plus any applicable fee ("overdraft"), we may pay or return the overdraft. The Credit Union's determination of an insufficient account balance may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do not have to notify you if your account does not have sufficient available funds to pay an overdraft. Your account may be subject to a charge for each overdraft regardless of whether we pay or return the overdraft. For ATM and one-time debit card transactions, you must consent to the Credit Union's overdraft protection plan in order for the transaction amount to be covered under the plan. Without your consent, the Credit Union may not authorize and pay an overdraft resulting from these types of transactions. Services and fees for overdrafts are shown in the document the Credit Union uses to capture the member's opt-in choice for overdraft protection and the Schedule of Fees and Charges.

Am. Compl., Ex. B at 4. Thus, from this language, Defendant asserts: "In very simple terms, it is [Defendant's] **payment** of the item that 'creates' the overdraft. The balance at the time of authorization is totally irrelevant to whether [Defendant] will assess an overdraft fee on a

particular debit card transaction." Mot. at 20 (emphasis in original). However, the next part of this argument relies on documents this Court has excluded, so the Court declines to consider this argument because it is predicated on several documents the Court has set aside. Id. at 21–23.

Second, Defendant argues that Plaintiffs' APPSN theory of liability "rests on the unsupported and faulty premise that funds are 'sequestered' and cannot be touched for any purpose other than payment of the subject swipe debit card transaction that [Defendant] authorized." Id. at 23. Defendant contends that the "Order of Payments" provision belies Plaintiffs' theory. In particular, Defendant states that "if authorization or the imposition of a hold meant money was instantly sequestered for payment, then the posted order of items would be immaterial as to whether there was enough money in the account to pay all of the presented items, and would have no impact on overdraft fees." Id. Therefore, Defendant asserts that under Plaintiffs' interpretation, the "Order of Payments" provision would be rendered superfluous, which provides: "[t]he order in which we process . . . transactions . . . may affect the total amount of overdraft fees." Id. (quoting Am. Compl., Ex. B at 4). Again, however, this argument relies on a section of the Membership Agreement provided by Defendant (the "How Transactions are Posted to Your Account" section) that this Court has already excluded. As a result, the Court declines to consider this argument.

Finally, Defendant claims that the Membership Agreement's "Enforcement" provision undermines Plaintiffs' claim. Mot. at 24. Defendant points to two provisions from the Membership Agreement that support its contention; the provisions include: (1) "[y]ou authorize us to deduct any such losses, costs, or expenses from your account without prior notice to you;" and (2) "[i]f we pay an overdraft or impose a fee that overdraws your account, you agree to pay the overdrawn amount in accordance with your overdraft protection plan . . . ." Id. According to

20

Defendant, these provisions read together show that "as soon as an intervening transaction . . . rendered [Plaintiffs'] available account balance negative, [Plaintiffs] owed [Defendant] the full amount of that overdraft caused by the intervening transaction as well as the associated fee." Id. at 24.

Plaintiffs dispute this interpretation. They assert that Defendant's promise to assess overdraft fees exclusively at authorization can be gleaned from language in the Membership Agreement, which Plaintiffs argue is comparable to similar agreements other courts have interpreted. Specifically, Plaintiffs cite to the Second Circuit decision in Roberts v. Capital One, N.A., 719 Fed. App'x 33, 35–36 (2d Cir. 2017). That case required the Second Circuit to interpret the meaning of "overdraft" in a similar agreement that raised the same issue of whether overdraft fees must be assessed at authorization or settlement. There, the Second Circuit specifically addressed whether it was reasonable for a consumer to understand the term "overdraft" as referring to a bank's choice to make a payment at the time the payment is "authorized" versus when it "settles" at a later date. Id. The Second Circuit concluded that reasonable consumers understand a debit card transaction to occur when it is authorized, not at the time of settlement. Id. at 37. The court noted, "[Defendant's] preferred interpretation of the agreement . . . makes little sense from the [account-holder's] point of view, as a reasonable consumer likely considers something to have been paid for when they swipe their debit card, not when their bank's back-office operations are completed." Id. at 37 (citation and quotations omitted).

In coming to this conclusion, the court interpreted the following provision: "We may in our sole discretion, and without obligation, *elect to pay* checks and other items drawn on your deposit account or to permit automatic bill payments and withdrawals against your account for

an amount in excess of your available balance (an 'overdraft')." Id. at 35 (emphasis added).

From this provision, the Second Circuit concluded that it is "equally reasonable to understand the

term 'Overdraft' as referring to Capital One's election to make a payment, which would occur at

the time of authorization (as asserted by [plaintiff]), or as referring to the payment itself, which

would occur at the time of settlement (as asserted by Capital One)." Id. at 36.

   Here, Plaintiffs argue that the same conclusion applies here because the agreement in the

Roberts case also relied on an interpretation of similarly linked phrases that are present in the

agreement before this Court. Specifically, Plaintiffs state that the agreement in Roberts "link[ed]

the moment of when the defendant 'pay[s] or return[s]' a transaction and 'exercises [its] right to

use [its] discretion to pay an overdraft'" with "when an overdraft occurs (i.e., authorization)."

Pls.' Resp. at 19 (quoting Roberts, 719 Fed. App'x at 36).

   To support the comparison, Plaintiffs cite two clauses from the Membership Agreement's

"Payment of Overdrafts" section containing language mirroring a provision in the agreement the

Roberts court analyzed. The clauses here include: (1) "[Defendant] may pay or return the

overdraft" and (2) when "[Defendant] exercise[s] [its] right to use [its] discretion to pay an

overdraft . . . ." Am. Compl. Ex. B at 3. Plaintiffs argue that these phrases explicitly link

overdrafts with when Defendant "pay[s] or return[s]" or "exercises [its] discretion to pay" a debit

card transaction, which is similar to the contract in Roberts. Pls.' Resp. at 20 (citing Roberts, 719

Fed. App'x at 35–36). Plaintiffs reason that the Roberts analysis applies here because although

that court relied on the "elect to pay," language regarding overdrafts, "discretion to pay"

regarding overdrafts in this case is similar enough to warrant the same finding here. Id. (citing

Roberts, 719 Fed. App'x at 35–36). Therefore, because of the similarities, Plaintiffs contend the

Court should follow the reasoning of <u>Roberts</u> and find that overdraft fees must be assessed at authorization. Pls.' Resp. at 20.

Alternatively, Plaintiffs argue that the "authorize and pay" language found in the Membership Agreement has been interpreted by other courts in this District as ambiguous with respect to whether overdraft fees must be assessed at authorization or settlement. Pls.' Resp. at 22 (collecting cases). Specifically, the relevant language provides: "Without your consent, the Credit Union may not authorize and pay an overdraft resulting from these types of transactions." <u>Id.</u> at 23 (citing Am. Compl., Ex. B at 3). Plaintiffs argue that this language does not make clear whether overdrafts are determined at the time of authorization or at settlement, such that granting a motion to dismiss based on this ambiguous language is inappropriate. Pls.' Resp. at 23–24.

After considering the parties' positions, this Court joins the other courts that have addressed similar arguments and finds that the disputed language in the Account Documents is ambiguous, because each party's interpretation is reasonable. <u>See e.g.</u>, <u>Lamoureux</u>, 592 F. Supp. 2d. at 30 ("Like other courts addressing similar arguments, the Court finds that the language in the relevant account documents is ambiguous, because both parties' interpretations of the disputed language is reasonable.")

With respect to whether OD fees are assessed at authorization or settlement, the Court finds reasonable Defendant's interpretation that the "Enforcement" provision coupled with Section 14(a) of the Membership Agreement could permit overdraft fees to be determined at the time a transaction is settled. However, it is also reasonable for Plaintiffs to assume that the Account Documents require overdraft determinations for debit card transactions at the time of authorization. <u>See</u> <u>Lamoureux</u>, 592 F. Supp. 3d at 30. Indeed, the Account Documents' coterminous use of the words "authorize and pay" regarding OD fees does not make clear

whether overdrafts are determined at the time of authorization or settlement. As a result, it is reasonable for Plaintiffs to assume that overdrafts are assessed at the time of authorization, as Plaintiffs suggest. This interpretation is supported by the Second Circuit's finding that "a reasonable consumer likely considers something to have been paid for when they swipe their debit card, not when their bank's back-office operations are completed." Roberts, 719 F. App'x at 37; see also Lamoureux, 592 F. Supp. 3d at 30–31 ("[The] coterminous use of 'authorize and pay,' which is also found in the Overdraft Disclosure, obfuscates the distinction the Bank attempts to make between 'authorization' and 'payment' when arguing that OD fees are assessed based on when the transaction is 'settled' or 'posted.'").

Similarly, the Court also agrees with Plaintiffs that it is reasonable to read Section 14(a) of the Membership Agreement as linking overdrafts with when Defendant "pay[s] or return[s]" or "exercises its discretion to pay" a debit card transaction. Am. Compl., Ex. B at 3. Because of this linkage, it is reasonable to read the Account Documents as promising accountholders that Defendant will make overdraft determinations for debit cards at the time of authorization in accordance with what the Roberts court concluded. See Roberts, 719 Fed. App'x at 35–36 (concluding that similar "elect to pay" language regarding overdrafts may reasonably refer to a bank's "election" to make a payment, which occurs at authorization, not settlement). In sum, it is reasonable to understand an overdraft payment as occurring at authorization—under Plaintiffs' interpretation—or as occurring at the time of settlement—under Defendant's interpretation. See id.

Accordingly, "[b]ecause the Court may not grant a motion to dismiss on a breach-of-contract claim when the contract is not clear and unambiguous, the Court will not dismiss

Plaintiffs['] breach-of-contract-claim related to the OD fees on APPSN transactions."
Lamoureux, 592 F. Supp. 2d at 31 (citations and quotations omitted).[3]

     *3. OON Fees on Balance Inquiries*

     Defendant next contends that Plaintiffs' claims regarding OON ATM Withdrawal and Inquiry Fees must be dismissed. Mot. at 25. Defendant urges the Court to dismiss this claim because according to Defendant, the Account Documents state, "If you use an ATM not operated by us, you may be charged a fee by the ATM . . . and you may be charged a fee for a balance inquiry even if you do not complete a funds transfer." Mot. at 26 (citing Ex. 5, Sec. 3). However, this language is derived from documents that the Court excluded, so the Court need not consider Defendant's argument.

     According to Plaintiffs, after Forjone placed his debit card into an OON ATM to make a cash withdrawal and balance inquiry, he was assessed a cash withdrawal surcharge paid to the ATM operator, a separate charge from Defendant for making an OON balance inquiry, and an additional fee from Defendant for making an OON cash withdrawal. Id. ¶ 143. Plaintiffs claim that Defendant's decision to charge more than one fee in this circumstance breached the Account Documents because "a balance inquiry is not a separate individual transaction and because Forjone was not warned beforehand." Id. ¶ ¶ 120, 134.

     Plaintiffs argue that the fee schedule stating that a single "ATM Fee" will be assessed for "withdrawals, inquiries and transfers" guarantees that "an out of network ATM will, at most,

---

[3] Because the Court has concluded that Plaintiffs' APPSN theory of liability survives the motion to dismiss with respect to whether OD fees are assessed at authorization or settlement, it need not determine whether the APPSN claim survives on the basis of Plaintiffs' alternative argument that Defendant "Places Debit Holds Immediately." Pls.' Resp. at 23–24.

result in a single OON fee, whether all or some of the functions enumerated in the list are

conducted." Pls.' Resp. at 27. The relevant language in the fee schedule provides:

Non AmeriCU (Foreign) ATM Fee…………………..................………………….$1.25 each
(Withdrawals, Inquiries, and Transfers).

Am Compl. Ex. B.

      Plaintiffs' position is predicated on the "conjunctive/disjunctive canon" as elaborated in

Justice Antonin Scalia and Bryan Garner's book READING LAW: THE INTERPRETATION OF LEGAL

TEXTS. Pls.' Resp. at 27. With respect to this canon of interpretation, Plaintiffs argue that

"[u]nder the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives."

Id. at 27 (emphasis in original). Thus, "mixing and matching, in short, is allowed under the

former but not the latter." Id. at 27–28. Plaintiffs further glean from Scalia and Garner that "With

the conjunctive list, all three things are required—while with the disjunctive list, at least one of

the three is required, but anyone (or more) of the three satisfies the requirement." Id. at 28.[4]

Thus, Plaintiffs argue that the text of the Fee Schedule controls and only has one meaning,

because the "word 'and' carries with it natural conjunctive import while the word 'or' carries

with it natural disjunctive import." Id. (quotations and citations omitted). Therefore, the Fee

Schedule "states that an out of network ATM will, at most, result in a single OON fee, whether

all or some of the functions enumerated in the list are conducted."  Id.

      In the Second Circuit: "The words and phrases [in a contract] should be given their plain

meaning, and the contract should be construed as to give full meaning and effect to all of its

provisions." Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co., 773 F.3d 110, 114

---

[4] In the Second Circuit, courts may interpret "and" and "or" to have conjunctive or disjunctive
meaning depending on the context. See Spanski Enter. v. Telewizja Polska S.A., 832 F. App'x
723, 725 (2d Cir. 2020) ("[I[t may be found that 'and' includes 'or' or that 'or' includes 'and,' as
reasonable construction requires.") (citations omitted).

(2d Cir. 2014) (quoting <u>Olin Corp. v. Am. Home Assur. Co.</u>, 704 F.3d 89, 99 (2d Cir. 2012)).

And as discussed above, a "contract is ambiguous if its terms could suggest more than one

meaning when viewed objectively by a reasonably intelligent person who has examined the

context of the entire integrated agreement and who is cognizant of the customs, practices, usages

and terminology . . . ." <u>Chesapeake Energy Corp.</u>, 773 F.3d at 114 (citations omitted).

    Here, the Court finds the provision ambiguous. The crux of the disagreement hinges on

the word "each." On one hand, "each" may suggest that Defendant will charge a $1.25 fee each

time a member conducts any and all of the ATM functions in a single visit, such that the

transactions are grouped together under a single fee. <u>See</u> *Each*, MERRIAM WEBSTER'S

COLLEGIATE DICTIONARY (10th ed. 1996) ("being one of two or more distinct individuals having

a similar relation and *often constituting an aggregate*") (emphasis added). Therefore, if a

member checks her balance and makes a withdrawal in a single visit at an OON ATM,

Defendant may charge only a single $1.25 fee for the transaction. Under this interpretation, there

is a $1.25 cap on each visit. On the other hand, the use of "each" can also be read to permit

Defendant to charge an account holder an independent $1.25 fee for each function the ATM

offers. <u>See id.</u> ("to or for each: APIECE"). As a result, when a member checks her balance, and

makes a withdrawal, Defendant may charge separate fees of $1.25 for each function. Therefore,

the language is ambiguous, which accords with the findings of other courts that have analyzed

similar contractual provisions and concluded that: "Although it is plausible to read 'each' as

applying to each transaction separately, it is just as plausible to read 'each' and 'and' in a way

which would group the different types of transactions together." <u>Galgano v. TD Bank, N.A.</u>, No.

20-CV-05625, 2021 WL 2472331, at *4 (D. N.J. June 17, 2021). Accordingly, because the Fee

27

Schedule is ambiguous, Defendant's motion to dismiss regarding Plaintiffs' OON ATM balance inquiry transactions claim is denied.

### D.  Implied Covenant of Good Faith and Fair Dealing

Defendant asserts that Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails because it is duplicative of their breach of contract claims. Mot. at 26–27.

"New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002). And "[a]lthough Plaintiff may plead alternative and inconsistent causes of action" Plaintiffs cannot plead a duplicative cause of action. See Lamoureux, 592 F. Supp. 2d at 38.

Here, the Court agrees with Defendant that Plaintiffs' implied covenant of good faith and fair dealing claim is duplicative of their breach of contract claims. Plaintiffs argue that "[b]y acting to maximize fee assessments . . . [Defendant] fails to exercise its vast power fairly and in good faith." Pls.' Resp. at 33. However, Defendant's alleged failure to act in good faith stems from its alleged failure to adhere to its contractual terms. In other words, "[t]hese allegations are the exact same as those used to support Plaintiffs['] breach of contract claim[s]." Lamoureux, 592 F. Supp. 2d at 38. Accordingly, the Court dismisses Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

### E.  New York General Business Law § 349

Defendant next urges the Court to dismiss Plaintiffs' GBL § 349 claim because Plaintiffs' "bare-bones allegations are conclusory in nature, and thus, insufficient to meet [the allegedly] heighted pleading standard [required by the statute]." Mot. at 27–28. Alternatively, Defendant argues that because its "fee practices complied with the clearly-stated terms of the

28

Account Documents, there also is no 'materially misleading' conduct in the first place to form the basis to support a claim under GBL § 349." Id. at 28.

"Section 349 prohibits '[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state, and provides a cause of action to 'any person who has been injured' by a violation of the section." Lamoureux, 592 F. Supp. 3d at 40 (quoting Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 122 (2d Cir. 2013)). "In order to successfully assert a claim under GBL § 349, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Lamoureux, 592 F. Supp. 3d at 40 (quoting Kronenberg v. Allstate Ins. Co., No. 18-CV-6899, 2020 WL 1234603, at *2 (E.D.N.Y. Mar. 13, 2020)).

The Court first disagrees with Defendant's characterization that a "heightened pleading standard" is required under GBL § 349. While some specificity is required, "Section 349 does not require plaintiff to allege fraud, and therefore the particularity requirements of Rule 9(b), Fed. R. Civ. P., are not triggered." Lava Trading Inc. v. Hartford Fire Ins. Co., 326 F. Supp. 2d 434, 438 (S.D.N.Y 2004); see also Fed. R. Civ. P. 9(b). As a result, the Court agrees with Plaintiffs that they plausibly state a claim under GBL §349. In particular, Plaintiffs note in their Amended Complaint that Defendant, "omitted, suppressed, and concealed the material fact that it would charge fees on APPSN transactions, charge multiple fees on the same transaction, and charge OON fees for balance inquiries made in connection with a withdrawal at an out-of-network ATM." Am. Compl. ¶ 169. Additionally, Plaintiffs further allege that, "[Defendant] systematically engaged in these deceptive, misleading, and unlawful acts and practices, to the detriment of Plaintiffs and members of the New York Subclasses." Id. And finally, as a "direct

29

and proximate result of [Defendant's] deceptive trade practices, members of the New York Subclass suffered injury and/or damages, including assessment of OD Fees on APPSN transactions, multiple fees on the same transaction, and OON fees for balance inquiries made in connection with a withdrawal at an out-of-network ATM." Id. ¶ 171.

    The Court finds that these allegations plausibly suggest a GBL §349 violation and provide the requisite level of specificity. These allegations satisfy the three elements of a GBL violation because these allegations plausibly allege that Defendant engaged in "(1) consumer-oriented conduct that is (2) materially misleading and (3) [P]laintiff[s] suffered injury as a result of the allegedly deceptive act or practice." Lamoureux, 592 F. Supp. 3d at 40 (citations omitted). This finding is in harmony with other courts that have analyzed nearly identical claims. See Lamoureux, 592 F. Supp. 3d at 40; Lussoro v. Ocean Fin. Fed. Credit Union, 456 F. Supp. 3d 474, 492 (E.D.N.Y. 2020). Accordingly, Defendant's motion to dismiss with respect to Plaintiffs' claim arising under GBL §349 is denied.

    **F.  Preemption**

    Finally, Defendant argues that Plaintiffs' claims are preempted by "the Truth in Savings Act ("TISA"), and other implementing regulations." Mot. at 29. Defendant contends that "Plaintiffs cast their claims as one for breach of contract, [but] they are actually challenging that [Defendant] does not 'plainly and clearly disclose [its practices].'" Id. And because "[t]he TISA implementing regulations require credit unions to provide disclosures regarding '[t]he amount of any fee that may be imposed in connection with the account . . . and the conditions under which the fee may be imposed,'" Defendant concludes that "[s]tate law requirements that are inconsistent with the requirements of the TISA and [its implementing regulations] . . . are preempted." Mot. at 29 (citing 12 C.F.R. § 701.1(d)).

It is well-established that "[t]he laws of the United States are 'the supreme law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" Coal. for Competitive Elec. Dynergy Inc. v. Zibelman, 906 F.3d 41, 49 (2d Cir. 2018) (citing U.S. Const. art. VI, cl. 2.) "Congress therefore may preempt state law through federal legislation." Zibelman, 906 F.3d at 49. Thus, the "inquiry into the scope of a [federal] statute's pre-emptive effect is guided by the rule that the purpose of Congress is the ultimate touchstone in every pre-emption cause." Id. (quoting Altria Group, Inc. v. Good, 555 U.S. 70, 76 (2008)). Relevant here, Congress enacted TISA to "require the clear and uniform disclosure of . . . (1) the rates of interest which are payable on deposit accounts by depository institutions; and (2) the fees that are assessable against deposit accounts, so that consumers can make a meaningful comparison between competing claims of depository institutions with regard to deposit accounts." Watson, 2022 WL 523543, at *2 (quoting 12 U.S.C. § 4301).

In addressing similar preemption claims, a court in the Eastern District of New York concluded that where a plaintiff's "claim rests on the contention that Defendant's representation about its overdraft fees were misleading" as opposed to "a claim that directly challenges the method by which Defendant decides to impose overdraft fees," the claim is not preempted. Lussoro, 456 F. Supp. 3d at 488. Likewise, another court in the Eastern District of New York addressed similar preemption claims and agreed with the outcome in Lussoro. See Watson, 2022 WL 523543 at *3. Specifically, the court in Watson found that although, "federal credit unions have the discretion to determine fee practices and disclosures free from state regulation inconsistent with the . . . TISA, and their implementing regulations, federal credit unions must still comply with the terms of their contracts related to fee practices and not affirmatively

misrepresent those practices." <u>Watson</u>, 2022 WL 523543 at *3 (citations omitted); <u>see also</u> <u>Lussoro</u>, 456 F. Supp. 3d at 488.

The Court agrees with the <u>Watson</u> and <u>Lussoro</u> courts. Here, Plaintiffs are not challenging Defendant's authority to charge NSF fees, OD fees on APPSN transactions, or OON fees on balance inquiries. <u>See generally</u> Am. Compl. Rather, Plaintiffs' claims arise from an alleged breach of the Account Documents and corresponding misrepresentations made by Defendant. Accordingly, because Plaintiffs do not seek to plead "claim[s] that directly challenge[] the method by which Defendant decides to impose overdraft fees," Plaintiffs' claims are not preempted under the TISA. <u>See Lussoro</u>, 456 F. Supp. 3d at 488; <u>cf. Baldanzi v. WFC</u> <u>Holdings Corp.</u>, No. 07-CV-9551, 2008 WL 4924987, at *2 (S.D.N.Y. Nov. 14, 2008) ("[C]auses of action sounding in contract, consumer protection statutes, and tort have repeatedly been found by federal courts not to be preempted."). Accordingly, Defendant's motion to dismiss predicated on preemption is denied.

## V.   CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's motion to dismiss (Dkt. No. 22) is **DENIED in part** with respect to (1) all of Plaintiffs' breach of contract claims; (2) Plaintiffs' GBL § 349 claim; and (3) dismissal on the basis of preemption; and it is further

**ORDERED**, that that Defendant's motion to dismiss (Dkt. No. 22) is **GRANTED in part** to the extent it sought dismissal of Plaintiffs' claim with respect to the implied covenant of good faith and fair dealing; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:    January 17, 2023
                Albany, New York

LAWRENCE E. KAHN
United States District Judge